**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | Case No.: 1:08-CR-22 |
| | ) | |
| **EDDIE LAMAR CARLISLE** | ) | |

**OPINION AND ORDER**

This matter is before the court on the motion to suppress filed by the defendant, Eddie Lamar Carlisle ("defendant" or "Carlisle") on May 9, 2008. Docket at 14. The Court held a hearing on the motion on July 25, 2008, and ordered the parties to submit further briefing on the issues raised during the hearing. Docket at 22. The United States of America (the "government") filed a response in opposition to the motion on September 3, 2008. Docket at 27. Carlisle filed a brief in support of his motion on October 20, 2008. Docket at 31. The government filed a reply brief on November 4, 2008. Docket at 32. Having heard the evidence and the arguments of counsel, and after reviewing the parties' briefs, the Court concludes for the reasons set forth below that the motion to suppress is DENIED.

**FACTUAL BACKGROUND**[1]

On February 18, 2008, Carlisle was visiting the residence of Michael Chapman ("Chapman") in Fort Wayne, Indiana. At the time, Chapman was in the home detention program of the Allen County Community Corrections ("ACCC") as a result of a state conviction for dealing cocaine. As with anyone on the home detention program, Chapman was subject to certain restrictions, including wearing an electronic monitoring device, being restricted to his

---

[1] The facts presented in this section are mostly undisputed, except for a few facts that are immaterial to the court's analysis and ruling. Disputed material facts are discussed later in this Order as they become relevant to the issues before the court.

home except if permitted to leave by officials with ACCC, and being forbidden to possess contraband such as illegal drugs and weapons. Also as a condition of his home detention, Chapman and any adults living in his home were required to sign a consent form indicating that they agreed to permit police to make unannounced visits to the home and to search it without a warrant. Chapman then was subject to periodic visits by corrections officers, both pre-scheduled and unannounced, in order to ensure that he was in compliance with the terms of his home detention. Carlisle did not live at Chapman's residence, and so he never signed the search consent form.

At some point while he was on home detention, Fort Wayne police received tips that Chapman was dealing drugs from his residence, which was located on Lillie Street in Fort Wayne. On February 18, 2008, at approximately 2:00 p.m., Fort Wayne Police Detective/Sergeant Tom Strausborger informed another Detective, Andrew Irick, who worked part-time with ACCC, of the suspected drug activity at Chapman's home. At the time, Strausborger and other officers from the Fort Wayne Police Department were conducting a drug raid on another house on Lillie Street. Detective Strausborger observed several people in cars and bicycles coming and going from Chapman's residence in a short period of time, which Strausborger knew from his experience was consistent with drug trafficking. Strausborger's observations appeared to corroborate the tips police had received about Chapman's suspected illegal activities.

Later that same day, at approximately 6:00 p.m., Detective Irick and other officers with ACCC, based on the information relayed earlier in the day by Detective Strausborger, went to Chapman's house to investigate the situation. Officers took positions at all sides of the house,

2

since they suspected illegal drug activity was taking place there, knew other adults lived in the home with Chapman, and based on their experience, knew that individuals who dealt drugs often possessed firearms.

Once officers were in position around the house, Detective Irick knocked on the front door. Irick could see through a small window on the front door and saw an adult female peek out and then begin manipulating the lock. The woman then shouted to someone inside the home named Michael, who officers suspected was Michael Chapman, and said that she could not get the door open. Irick could also hear people moving around quickly inside the home and surmised that there were several people inside. At the time of this visit, Irick was wearing a police uniform and had identified himself as a police officer when he knocked on the door. ACCC Officer Jeff Halsey told Irick that he observed a man, a woman, and a young child moving around inside the house as Halsey was looking in through a side window. Then, Irick and Halsey both heard the sound of breaking glass coming from inside the residence.

Someone inside the residence finally opened the front door. At the same time, officers positioned at the rear of the home radioed that they had apprehended an individual who had exited the home through a back door. Detective Michael Smothermon and ACCC Officer Matt Snyder were the officers positioned at the rear of the residence. As Irick was trying to get someone to answer the front door, Smothermon observed someone peeking out from behind window blinds on a window at the rear of the house. Shortly thereafter, a person exited through the back door of the home and began to flee the premises. This individual was later identified as the defendant, Eddie Carlisle. Smothermon drew a taser, identified himself as a police officer, and ordered Carlisle to lie down on the ground, which he did. Carlisle was carrying a backpack,

and he laid the backpack on the ground near him.  Given the entirety of the circumstances, and because he did not yet know who Carlisle was (including whether he was the individual subject to home detention), Smothermon decided to handcuff Carlisle.  Also, because it was cold outside, Smothermon took Carlisle (and the backpack he had been carrying) back inside the home to investigate further.  Once inside, Smothermon conducted a "pat down" search of Carlisle's person to determine if Carlisle was in possession of any weapons (which he was not).

Once Irick and the other officers entered the front of the home they informed the occupants that they were there to perform a home detention visit.  As soon as he entered the home, Irick encountered an individual named Kelly Belcher, conducted a pat down search of Belcher, and discovered a bag of white powder in his pocket.  Officers secured the adults in the living room at the front of the house.  This included Belcher, a woman named Latoya Cobb, and Chapman (who approached from the kitchen area).  The officers then conducted a protective "sweep" of the home and basement.  They also allowed Cobb and an older child who was present to attend to other, younger children who were in a second floor room at the time of the protective sweep.  With the exception of Carlisle, no one else attempted to leave the residence.

Officers then proceeded to conduct a search of the home and discovered evidence of drugs.  Also, Irick inspected the lock on the front door and found that it was operating properly.  In the basement, police found a pile of broken glass that used to be a Pyrex measuring container.  They also discovered a white, powdery residue on or inside a microwave.  This residue tested positive for cocaine during a field test.  Also in the basement, inside a "baby wipe" container, police discovered $22,000 in cash, separated into $1,000 bundles.

Meanwhile, after bringing Carlisle back inside the home, Officer Snyder opened the backpack and looked inside, observing what he believed to be marijuana and an off-white, rock-like substance. Also in the backpack was a scale, a spatula, and packaging material. When Irick looked inside the backpack, he identified the rock-like substance as a freshly "cooked" piece of crack cocaine commonly referred to as a "cookie." This substance tested positive for cocaine during a subsequent field test. Snyder read Carlisle his Miranda rights (after having looked inside the backpack) and then asked him about the backpack. Carlisle told Snyder that he picked the backpack up inside the house without knowing what was inside it and ran outside the home. At the time the officers looked inside the backpack, Carlisle was still handcuffed and did not have access to the backpack.

Police also interviewed Tamara Parrish, who lived at the house. Parrish told police that she had no personal knowledge of drug trafficking activity taking place in her home, although she admitted she had suspected Chapman of dealing drugs since he was unemployed but always seemed to have money. She also told police that Carlisle was probably involved with Chapman in dealing drugs because she knew of no other reason Carlisle would be present at the home.

As a result of the police investigation and search on February 18, 2008, Carlisle was charged in this case with one count of possession with intent to distribute cocaine base "crack" and one count of possession with intent to distribute marijuana. *See* Indictment, docket at 1. In his current motion to suppress, Carlisle argues that "police officers did not have sufficient specific and articulable facts that would justify the detention of Defendant . . . ." Motion to Suppress, p. 1. Carlisle contends that "[a]s a result of the illegal detention, Defendant was questioned and made statements which he believes the Government will seek to introduce into

evidence. Defendant contends that these statements should be suppressed, as well as any evidence seized alleged to relate to him." *Id*., pp. 1-2.

## DISCUSSION

The Fourth Amendment protects citizens "against unreasonable searches and seizures." U.S. Const. Amend. IV. The Amendment reads in full: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated; and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

Police officers may conduct an investigatory stop of an individual if they have reasonable suspicion based on articulable facts that a crime is about to be or has been committed. *Terry v. Ohio*, 392 U.S. 1, 30 (1968). When evaluating whether reasonable suspicion was present, a court must examine the totality of the circumstances known at the time of the stop, viewed from the standpoint of an objectively reasonable police officer. *Ornelas v. United States*, 517 U.S. 690, 696 (1996); *United States v. Askew*, 403 F.3d 496, 507 (7th Cir. 2005). The court's determination of reasonable suspicion should be based on commonsense judgment and reasonable inferences about human behavior. *United States v. Baskin*, 401 F.3d 788, 791 (7th Cir. 2005).

Police officers may detain and question anyone if the person consents to the questioning. Absent consent, officers are required to justify their actions with some level of suspicion. *Terry v. Ohio*, 392 U.S. 1 (1968) (a protective frisk or pat-down search, however brief, requires a minimal level of suspicion). Indeed, *Terry* leaves no doubt that "to justify a warrantless pat-down search without probable cause, the officer must also be able to point to specific and

6

articulable facts indicating that the individual may be armed and present a risk of harm to the officer or to others." *United States v. Brown,* 188 F.3d 860, 864 (7th Cir. 1999) (citing *Terry*, 392 U.S. at 26-27).

"'Reasonable suspicion' is 'a quantum of proof less demanding than probable cause'...but a 'hunch' will not suffice....There must be 'some minimal level of objective justification for making a stop.' . . . The officer must be able to set forth 'specific and articulable facts' which, based on 'the totality of the circumstances--the whole picture,' are 'sufficient to give rise to [the] reasonable suspicion' of criminal activity. . . ." *Brown*, 188 F.3d at 864. A court is to take into account the entire set of circumstances surrounding the stop in determining whether the same violated *Terry*. That is, "the whole picture must be taken into account in determining whether the police are justified in conducting a *Terry* stop, including the inferences and deductions made by a trained police officer." *United States v. Thornton*, 197 F.3d 241, 248 (7th Cir. 1999). "Circumstances which appear innocent to the outside observer may suggest criminal activity to experienced law enforcement personnel who may assess these circumstances in light of their experience." *Id.*

Nervous or evasive behavior is another pertinent factor in determining reasonable suspicion, *United States v. Brignoni–Ponce*, 422 U.S. 873, 885 (1975), as is the experience of the law enforcement agent. *United States v. Odum,* 72 F.3d 1279, 1284 (7th Cir. 1995). While the presence or absence of factors such as these aid the court in its assessment of the facts, this court is cognizant that "in reviewing the propriety of an officer's conduct, courts do not have available empirical studies dealing with inferences from suspicious behavior, and this Court cannot reasonably demand scientific certainty when none exists. Thus, the reasonable suspicion

determination must be based on commonsense judgments and inferences about human behavior." *Wardlow*, 528 U.S. at 124 (citing *United States v. Cortez*, 449 U.S. 411, 418 (1981)).

In this case, Carlisle was stopped and detained after he was spotted exiting Chapman's home through a back door and, at least as far as Smothermon knew at the time, attempting to flee. Transcript of Suppression Hearing Held on July 25, 2008, p. 38.[2] At the time Carlisle exited the house, it is undisputed that officers were present for the purpose of an unannounced visit to the home of an individual on home detention. And, as previously stated, police had received a tip that Chapman's residence was the site of drug trafficking activity. For these reasons, the officers who were present, including Smothermon, were understandably cautious. When Smothermon saw an individual exit the rear door of the home and begin to leave the premises, he had reasonable suspicion that something was afoot. Therefore, he ordered Carlisle to stop and lie down on the ground. Tr., p. 39. During the suppression hearing, Smothermon testified as follows concerning his state of mind when he saw Carlisle exit the house:

> Q. Did you have any sort of, um, conclusion about what might have been going on here based on the circumstances?
> A. We, um, were there to, um, search the home based on tip information that there may be narcotics that could be going on [sic], and they would be looking out the blinds and, and, um, this, um, individual suddenly bursting out the rear of the home attempting to flee, I felt it prudent to stop and see what he might be doing. That seemed suspicious to me.

*Id.*, p. 40. The court notes that Carlisle testified at the hearing that he left the house and was walking, not running, toward the alley behind the home. Tr., pp. 92, 94. Carlisle's testimony also contradicted Smothermon's in one other respect. Smothermon testified that he identified himself as a police officer right before he directed Carlisle to lie down on the ground, but

---

[2] References to the transcript of the suppression hearing will be cited as "Tr., p. ___ ."

Carlisle claimed that neither Smothermon nor Snyder identified themselves. *Id*., p. 94. According to Carlisle, the officers "ran at me gunpoint [sic] drawn and confirmed [sic] me to lay on the ground." *Id*. Carlisle admitted that he exited the house through the rear door, that he was carrying the backpack, and that he glanced to his left immediately after exiting the residence. *Id*., p. 91. However, Carlisle testified that he looked to his left not to see if police were outside, but rather to "[c]heck out a lady friend, see if she was out there smoking a cigarette to wave at her[.]" and that the alleged lady friend (had she been outside, which Carlisle said she was not) would have been "[l]ike two houses down if she be over there . . ." *Id*., p. 92. The court finds the testimony of Smothermon to be much more credible than that of Carlisle on these factual points. However, it hardly matters whether Carlisle was running from the home or merely walking. If he was running, certainly it could be argued that he was acting more suspiciously than if he were simply walking. But nonetheless, given the totality of the circumstances known to Smothermon and Snyder at the time, the mere fact that Carlisle was leaving the home out the back door at the same time police were knocking at the front door trying to gain entry was suspicious indeed. Also, Carlisle exited the house soon after Smothermon observed someone peeking out of window blinds from inside the home. Furthermore, Smothermon testified that when he saw Carlisle exit the residence, he did not know who Carlisle was or whether Carlisle was the individual who was on home detention. In other words, Smothermon did not know whether Carlisle was actually Chapman attempting to flee the home. It is clear from the facts, as presented at the suppression hearing, that officers had a legitimate reason to stop Carlisle, to order him to the ground, and subsequently to handcuff him while they ascertained his identity and attempted to discover why he was leaving the residence at that particular time.

9

The analysis now turns to the decision by the officers to open the backpack Carlisle was carrying and to look inside of it. Once Smothermon and Snyder brought Carlisle back into the home, Smothermon conducted a "pat down" frisk of Carlisle to ensure that Carlisle was not in possession of a firearm or other weapon. Tr., p. 42. Officer Snyder opened the backpack Carlisle had been carrying and looked inside it. Tr., p. 67. When he did so, Snyder saw what he recognized as marijuana in a clear plastic bag. *Id*. He also saw a "cookie-shaped off-white substance" which he admitted he did not recognize. *Id*.[3] Also in the backpack was "a black scale with white powdery residue on it and a black-handled spatula also with a white powdery residue on it and packaging material." Tr., p. 68. Snyder then read Carlisle his *Miranda* rights. *Id*., pp. 68-69. Snyder then asked Carlisle about the backpack and its contents. *Id*. According to Snyder, Carlisle responded that "he just picked it up and ran outside with it." *Id*., p. 69. Snyder also testified that Carlisle denied any knowledge of the contents of the backpack. *Id*. Snyder also testified that Carlisle "didn't claim or deny ownership of [the backpack]." *Id*. On cross-examination, Carlisle had the following exchange with the Assistant U.S. Attorney concerning the backpack:

> Q. You were taking the bag to the garage?
> A. Yes, sir.
> Q. Going to throw it away?
> A. No. Just asked me to put it in there.
> Q. They asked you to put it in there?
> A. He, he asked me.
> Q. Who asked you?
> A. Michael Chapman.
> Q. Because it wasn't your bag, right?

---

[3] This substance turned out to be crack cocaine, but Snyder testified that he had never seen crack cocaine in this "cookie" form before and so was not sure what it was. *Id*. Detective Irick, however, was able to identify the substance when he looked into the backpack. *Id*., p. 21.

10

> A. No.
> Q. It was Chapman's bag?
> A. Yes, sir.
> Q. You didn't know what was in it?
> A. No.
> Q. That is what you told the officer, right?
> A. Yes.
> Q. The bag was inside the house prior to you taking it out?
> A. Yes.
> Q. And Chapman is the one that told you to take it out?
> A. Yes.
> Q. You knew the police were at the front door?
> A. No.
> Q. You didn't hear them knocking?
> A. No.
> Q. Was there a bunch of commotion right before you left?
> A. No.

*Id.*, pp. 94-95. Carlisle also testified that at the time of this incident, he knew Chapman was on home detention, although he said he did not know that Chapman was on detention as a result of a conviction for dealing cocaine. *Id.*, pp. 96-97.

In its response in opposition to Carlisle's motion to suppress, the government argues that Carlisle's own testimony reveals "that he cannot challenge the search of the backpack because he does not have a reasonable expectation of privacy. Fourth Amendment rights are personal rights that may not be asserted vicariously; in other words, the legality of a search of another person's property cannot be asserted to suppress evidence located as a result of the search." Government's Brief in Opposition, p. 8 (citing *Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978); *United States v. Amaral-Estrada*, 509 F.3d 820, 826-27 (7th Cir. 2007); and *Bond v. United States*, 77 F.3d 1009, 1013 (7th Cir. 1996)). The government contends that "a defendant 'cannot eschew ownership of the bag and then assert that a search of it violates [his] Fourth Amendment rights.'" *Id.*, p. 9 (quoting *United States v. Smith*, 3 F.3d 1088, 1096 (7th Cir. 1993)). Thus,

according to the government, because of his testimony, "Carlisle cannot vicariously assert Chapman's rights with respect to the backpack." *Id.*, p. 10. The government points out that "[t]he backpack was inside Chapman's house, and Carlisle claimed no knowledge of the contents, much less a personal privacy expectation regarding the contents." *Id.* Consequently, the government contends, "Carlisle cannot challenge the search of the backpack." *Id.*[4]

The government also argues that even assuming Carlisle could establish that he had a reasonable expectation of privacy in the backpack, the search of that item was not a violation of his Fourth Amendment rights. The government maintains that "[j]ust like the detention of a person, the seizure of a bag or luggage from the immediate possession of a suspect is similarly appropriate when officers have reasonable suspicion to believe that the bag contains contraband or evidence of a crime." *Id.*, p. 12 (citing *United States v. Place*, 462 U.S. 696, 708-09 (1983) and *United States v. Ward*, 144 F.3d 1024, 1030-31 (7th Cir. 1998)). In the *Ward* case, the defendant was arrested at a Greyhound bus station when police suspected he was transporting narcotics in a piece of luggage. Police removed the luggage Ward placed on the bus in Missouri, subjected it to examination by a drug sniffing dog who alerted that it contained drugs, and, after then obtaining a search warrant, opened the bag and discovered a kilogram of cocaine inside. Ward filed a motion to suppress, arguing that the police did not have a reasonable basis for removing the bag and submitting it to a canine "search," and that their actions violated his

---

[4] It might seem counterintuitive for a defendant to claim ownership and/or a privacy interest in an item containing contraband so that he can then challenge the search of that item on Fourth Amendment grounds. However, as the government points out in its brief, the courts have taken that apparent conundrum into consideration by holding that a defendant's testimony given to establish standing for Fourth Amendment purposes cannot then be used as direct evidence of guilt at trial. Government's Brief in Opposition, p. 9 (citing *United States v. Meyer*, 157 F.3d 1067, 1079 (7th Cir. 1998)).

Fourth Amendment rights. The trial court denied the motion. In affirming the trial court, the Seventh Circuit held as follows:

> The Supreme Court has held that "when the police seize luggage from the suspect's custody, ... the limitations applicable to investigative detentions of the person should define the permissible scope of an investigative detention of the person's luggage on less than probable cause." *Place,* 462 U.S. at 708-09, 103 S.Ct. at 2645. Thus, the detention of a traveler's luggage must be supported by a reasonable belief, based on specific and articulable facts, that it contains contraband. *Id.* at 703, 103 S.Ct. at 2642; *see Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968). The detention itself must also be reasonable, *Place,* 462 U.S. at 706, 103 S.Ct. at 2644, an assessment that turns on the diligence of the authorities, the length of the detention, and the information conveyed to the suspect, *id.* at 709-10, 103 S.Ct. at 2645-46.

*Ward*, 144 F.3d at 1030. After explaining the standard to be applied in such cases, the Seventh Circuit then also held as follows:

> Assuming that [the police] could not have detained the bag for the sniff without reasonable suspicion that the bag contained contraband, we conclude that [police] had such suspicion when [they] made the decision to do so. "Reasonable suspicion" is "more than an inchoate and unparticularized suspicion or hunch." [*United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989)] (quoting *Terry,* 392 U.S. at 27, 88 S.Ct. at 1883) (internal quotations omitted). It is a concept that "is not 'readily, or even usefully, reduced to a neat set of legal rules.' " *Id.* (quoting *Illinois v. Gates,* 462 U.S. 213, 232, 103 S.Ct. 2317, 2329, 76 L.Ed.2d 527 (1983)). In determining whether a reasonable suspicion existed, we must consider the "totality of the circumstances." *Id.* at 8, 109 S.Ct. at 1585; *United States v. Odum,* 72 F.3d 1279, 1284 (7th Cir. 1995). In the end, the analytical process requires a practical determination; it "does not deal with hard certainties, but with probabilities." *United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981).... *United States v. Jerez*, 108 F.3d 684, 693 (7th Cir.1997); *see also Ohio v. Robinette,* 519 U.S. 33, 117 S.Ct. 417, 421, 136 L.Ed.2d 347 (1996) ("Reasonableness ... is measured in objective terms by examining the totality of the circumstances."). If we are satisfied that the facts confronting [the police] would give rise to a reasonable suspicion that Ward's suitcase contained contraband–a question that calls for the exercise of common sense–then [the] decision to detain the bag for further investigation did not violate Ward's Fourth Amendment rights. *See Jerez,* 108 F.3d at 693.

*Id*. at 1034. Based on *Ward* and *Place* cases, the government argues that the decision by police

13

to take possession of the backpack Carlisle was carrying was legitimate based on the circumstances they faced.

The question turns next on the decision to open the backpack and examine its contents (assuming, again, that Carlisle has any standing to challenge the search in the first place). The government argues that this decision was also a legitimate one based on the totality of the circumstances. Government's Brief in Opposition, pp. 12. The government states that "[d]uring the course of a *Terry* stop, an officer who has a reasonable fear for safety may conduct a protective search for weapons of an individual's person, the area within his control, his vehicle, and any containers or luggage being carried by him." *Id*., n. 4 (citing *Michigan v. Long*, 463 U.S. 1032, 1049-50 (1983) (search of passenger compartment of vehicle) and *Cady v. Sheahan*, 467 F.3d 1057, 1061-62 (7th Cir. 2006) (search of briefcase carried by a suspect)). In the present case, given that the officers had surrounded a house occupied by an individual on home detention for a drug conviction, and who police suspected was dealing narcotics, the government contends that the officers were completely justified in opening the backpack and looking inside to make sure it did not contain any weapons. *Id*. The government notes that Detective Irick testified that in his experience, it is common to find guns "in a home when there were narcotics as well." Tr., p. 13. In fact, Irick testified that in his experience, guns and drugs "go hand in hand." *Id*. Smothermon and Snyder also testified that weapons are often present at scenes where drugs are found and that on the date in question, they were both concerned about officer safety. Tr., p. 41 and p. 66. Therefore, after Carlisle was stopped in the back yard, he was handcuffed, escorted back inside the residence, frisked, and the backpack was searched.

Carlisle argues that the government's interpretation of the applicable case law is

erroneous and that he does, in fact, have a right to challenge the search of the backpack. Defendant's Brief in Support, p. 4. Carlisle contends that the *Bond* case cited by the government "delineates the test which is applicable to this case. The Court focuses its inquiry on the information available to the officers at the moment Officer Snyder opened the red backpack to determine whether Defendant had any reasonable expectation of privacy in it at that time." *Id*. Carlisle points out that in the *Bond* case, a police officer advised Bond of his rights and asked the him whether he owned a suitcase he was traveling with. Bond denied ownership of the suitcase, at which point the police officer searched the suitcase and found drugs. The Seventh Circuit held that since Bond denied ownership of the suitcase, he lacked standing to challenge the search of that suitcase on Fourth Amendment grounds.

Carlisle argues that a proper interpretation of the *Bond* case reveals that "if a defendant is 1) advised of his rights, 2) and then asked about ownership, 3) which he then denies, 4) the officer may be allowed to search the bag in question." *Id*., p. 5. Carlisle argues that he was not informed of his *Miranda* rights until after Snyder searched the backpack and that "at no time did Defendant disavow ownership of the bag." *Id*.[5] Carlisle states that the evidence at the suppression hearing indicated only that "[h]e did not claim or deny ownership of it." *Id*. (quoting testimony of Officer Snyder, Tr., p. 69). Thus, at the time Snyder looked into the backpack, Carlisle had not expressly denied ownership of it, which he claims would be a

---

[5] It would not have made much sense for the police to read Carlisle his *Miranda* rights at any earlier point, since he was not under arrest. Until then, they had only reasonable suspicion that he might have been involved in some criminal activity since he was exiting (and apparently fleeing) Chapman's house. In other words, police clearly had a legitimate reason to stop Carlisle and detain him, but an individual who is detained (and even frisked for weapons) is not entitled to be informed of his or her *Miranda* rights.

prerequisite, under *Bond*, to justify the search of the backpack. *Id*.

According to Carlisle, then, the "evidence at hearing showed that Officer Snyder searched the bag without any probable cause or pursuant to the *Bond* sequence of events." *Id*. It is true that the court in *Bond* found that "Bond denied owning the suitcase *before* the search." *Bond*, 77 F.3d at 1013 (italics added). However, the sequence of events in the case was not the sole or even the major basis for the court's holding in *Bond*. Also, the court did not expressly hold that events must unfold in the order in which Carlisle lists them before police can conduct a warrantless search of a bag or piece of luggage. This court does not interpret the *Bond* case, or the other cases involving police searches of bags, suitcases, or other such items, as narrowly as Carlisle urges. The issue is not whether Carlisle was read his *Miranda* rights before police looked inside the backpack or whether he expressly denied ownership of the backpack before that point. The real issue is whether, given the totality of the circumstances facing police at the time, it was reasonable for the officers to detain Carlisle in the first place, and then to look into the backpack.

The government states in its reply brief that "[t]he fatal flaw in the Defendant's legal analysis is that he is borrowing concepts regarding the abandonment of property when he has never claimed an interest in the property in the first place." Government's Reply Brief, p. 7. The government then reiterates its argument that "[t]he starting point of the analysis is whether the defendant has a reasonable expectation of privacy in the area subjected to search because a defendant cannot assert another person's Fourth Amendment privacy interest." *Id*. (citations omitted).

While it is true that, according to Snyder's testimony, Carlisle "didn't claim or deny

16

ownership" of the backpack when Snyder asked him about it, it is also true, according to Carlisle himself, that the backpack belonged to Chapman, that Chapman asked Carlisle to take it outside to the garage, and that Carlisle had no knowledge of its contents. Tr., pp. 94-95. Apparently, Carlisle is arguing that since he neither claimed ownership of the backpack nor denied ownership of it, the police had no right to search it without first reading him his *Miranda* rights and, possibly, without first pressing him to expressly state whether or not the bag belonged to him. Under Carlisle's scenario and interpretation of the law, any suspect in a similar situation could simply remain silent about his ownership or control of a backpack, suitcase, briefcase, or other similar bag, and later present a Fourth Amendment challenge a search of that item by police even while testifying under oath that the item did not belong to him in the first place.

Carlisle's argument in support of his motion to dismiss is flawed in two respects. First, as the government contends, he is attempting to raise a Fourth Amendment challenge to the search of property which he stated under oath never belonged to him. Second, he mistakenly claims that the police had no legitimate reason (i.e., reasonable suspicion) to look inside the backpack under the circumstances of this case.

This court has no reservation whatsoever in concluding that the police at Chapman's residence on February 18, 2008, had reasonable suspicion to stop Carlisle, to detain him (even in handcuffs[6]), and to conduct a pat-down search or frisk of his person to ensure that he was not

---

[6] The fact that an individual is handcuffed does not automatically turn a lawful *Terry* stop into an arrest. *U.S. v. Smith*, 3 F.3d 1088, 1094 (7th Cir. 1993). *See also*, *United States v. Esieke*, 940 F.2d 29, 36 (2nd Cir. 1991); *United States v. Taylor*, 716 F.2d 701, 709 (9th Cir. 1983); *United States v. Saffeels*, 982 F.2d 1199, 1206 (8th Cir. 1992). Police may place individuals in handcuffs during a *Terry* stop to ensure the safety of officers and the public. *United States v. Kapperman*, 764 F.2d 786, 790 (11th Cir. 1985).

17

armed. Based on the testimony of the officers, which the court found to be credible, the circumstances at Chapman's house on that date made it reasonable for all the officers present to be concerned about officer safety. And even though there were some conflicts between the testimony of Carlisle, on the one hand, and Smothermon and Snyder, on the other, the court concludes that these two officers responded reasonably (and even prudently) when confronted with Carlisle as he exited the back door of Chapman's house. As the court stated previously, whether Carlisle was walking or running, or whether he glanced around in various directions or only turned his head to the left to possibly waive to someone, are not material factual discrepancies.[7] It was not unreasonable for Smothermon and Snyder to be suspicious once Carlisle exited the home, given the reasons for police presence there at the time, the fact that police had received a tip that drug trafficking activity may be occurring at the residence, the fact that they knew from experience that if drugs were present it was at least likely that weapons might also be present, and the fact that Smothermon and Snyder did not know whether Carlisle was in fact Chapman attempting to flee the scene to avoid a confrontation with police. Thus, the officers had reasonable suspicion to stop and detain Carlisle and to investigate his activities further.

Carlisle's argument that he neither confirmed nor denied ownership of the backpack, and is therefore entitled to assert a privacy interest in it, is likewise rejected. Carlisle testified at the suppression hearing that the bag was not his, he was unaware of its contents, and that he told police that at the scene. Tr., p. 95. Carlisle might not have used the words, "it's not mine," but

---

[7] The court reiterates that it resolves these discrepancies in favor of the government, since the testimony of Officers Smothermon and Snyder was more credible than the testimony of Carlisle.

he did say everything but that. By claiming that the bag belonged to Chapman and that he knew nothing of its contents, Carlisle disavowed ownership of the bag–at least impliedly. No magic or literal words were necessary to accomplish this and Carlisle cannot, as the government puts it, have it both ways by claiming the backpack was not his and then claiming a Fourth Amendment right to privacy to the bag and its contents. Finally, even if Carlisle could establish any reasonable expectation of privacy regarding the backpack, his Fourth Amendment rights were not violated when Snyder opened the bag to look inside to ensure it did not contain weapons.

## CONCLUSION

For the reasons set forth in this Opinion and Order, the motion to suppress filed by the defendant, Eddie Lamar Carlisle, is DENIED.

Entered: December 3, 2008.

   /s/   William C. Lee
William C. Lee, Judge
United States District Court
Northern District of Indiana